**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

PAUL J. PINKSTON,
        Petitioner,

v.                                                    Case No. 8:23-cv-333-KKM-CPT

SECRETARY, DEPARTMENT
OF CORRECTIONS,
        Respondent.
_____

## **ORDER**

Pinkston, a Florida prisoner, timely[1] filed a counseled Amended Petition

for Writ of Habeas Corpus under 28 U.S.C. § 2254. (Doc. 10.) Having

considered the amended petition, (*id.*), the response in opposition, (Doc. 21),

and Pinkston's reply, (Doc. 24), the amended petition is denied. Because

---

[1] A state prisoner has one year from the date his judgment becomes final to file a § 2254 petition. *See* § 2244(d)(1). This one-year limitation period is tolled during the pendency of a properly filed state motion seeking collateral relief. *See* § 2244(d)(2). Pinkston's judgment and sentence were affirmed on direct appeal on August 30, 2017. (Doc. 15-4, Ex. 6.) The judgment became final 90 days later, on November 28, 2017, upon expiration of the time to petition the Supreme Court of the United States for a writ of certiorari. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002). Pinkston filed his motion for postconviction relief on November 26, 2018, after 362 days of untolled time elapsed. Pinkston's postconviction proceeding remained pending until February 22, 2023, when he voluntarily dismissed his appeal of a resentencing order that the trial court had entered on remand. (Doc. 15-7, Ex. 18.) Pinkston filed his federal habeas petition earlier, on February 14, 2023. Because less than one year of untolled time elapsed, Pinkston's federal habeas petition is timely.

reasonable jurists would not disagree, Pinkston is not entitled to a certificate of appealability.

## I.   <u>**INTRODUCTION**</u>

### A. Procedural Background

A state court jury convicted Pinkston of two counts of armed robbery and one count of armed kidnapping. (Doc. 15-2, Ex. 1, pp. 180-81, 184.) The jury found Pinkston not guilty of another count of armed kidnapping. (*Id.*, pp. 178-79.) The state trial court sentenced him to consecutive terms of 10 years in prison for each robbery, and a concurrent term of 10 years in prison for armed kidnapping. (*Id.*, pp. 184-189.) The state appellate court per curiam affirmed the convictions and sentence. (Doc. 15-4, Ex. 6.)

Pinkston's motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 was denied. (Doc. 15-5, Ex. 8; Doc. 15-6, Ex. 8a.) The state appellate court reversed the summary denial of one of Pinkston's claims but affirmed the denial of his remaining claims without comment. *Pinkston v. State*, 330 So.3d 124 (Fla. 2d DCA 2021).

The state appellate court agreed that Pinkston had a strong argument that trial counsel should have informed the state trial court that it had discretion to impose concurrent sentences for the two armed robberies, and remanded for the state trial court to reconsider Pinkston's argument in the light of its opinion. *Id.* at 128-29. On remand, the state trial court amended the

2

sentence to concurrent terms of 10 years in prison for the armed robbery charges, and a consecutive term of 20 years in prison for the armed kidnapping charge. (Doc. 15-7, Ex. 16.) Thus, while the sentence structure was amended, the overall sentence length remained 20 years. (*Id.*) Pinkston voluntarily dismissed his appeal of this sentence. (Doc. 15-7, Exs. 17 & 18.)

### B. Factual Background[2]

On June 3, 2015, Pinkston, using the name Robert Evans, called realtor Elaine Goller to view a home for sale in St. Petersburg, Florida. (Doc. 15-3, Ex. 1a, doc. pp. 314-15.) They agreed to meet at the house at 12:30 p.m. that day. (*Id.*, doc. p. 320.) Pinkston, wearing a small hat and wraparound sunglasses and carrying a black bag, arrived in a silver vehicle. (*Id.*, doc. pp. 320-21, 328.)

Inside the home, Goller was looking down at paperwork when she heard Pinkston say, "Sorry about this." (*Id.*, doc. pp. 326-27.) She looked up to see Pinkston pointing a gun at her. (*Id.*, doc. p. 327.) Pinkston produced a pair of handcuffs and told her to put them on and sit against the wall. (*Id.*, doc. pp. 328-29.) After she complied, Pinkston instructed Goller to call her husband on her phone. (*Id.*, doc. pp. 330-31.) Pinkston took the phone, and Goller heard Pinkston demand $50,000.00 from her husband. (*Id.*)

---

[2] This factual summary is based on the trial transcript and appellate briefs.

3

Pinkston then put zip ties around Goller's wrists and ankles, returned the handcuffs to his bag, and took her keys and phone before leaving the house. (*Id.*, doc. pp. 333-35.) Security footage from a neighbor's property showed Pinkston driving away at 12:42 p.m. (*Id.*, doc. pp. 502-03.)

Detective Rodney Tower responded to the scene. Goller described the perpetrator as a white male in his late forties to early fifties, about 5'5" to 5'6" tall, weighing about 175 pounds, clean-shaven, and with short gray or blond hair. (*Id.*, doc. pp. 604-06.) Goller described him as wearing a light-colored dress shirt, dark dress pants, sunglasses, a straw fedora hat, and short hair. (*Id.*, doc. pp. 605-06.) But Goller did not get a clear view of Pinkston's face because he walked in front of her through the house, and she avoided looking at him after he pulled the gun. (*Id.*, doc. p. 349.)

As Detective Tower was talking to Goller, he received a call about a robbery of another realtor that had just occurred. (*Id.*, doc. p. 607.) Police would learn that earlier that day, Pinkston, again identifying himself as Robert Evans, left a voicemail for realtor Valerie Jarnberg, asking to see a house listed for sale. (*Id.*, doc. pp. 416-17.) Jarnberg arranged for her colleague Ana Devine to handle the showing. (*Id.*, doc. pp. 419-20.) Pinkston and Devine met at the property around 1:30 p.m. (*Id.*, doc. pp. 819-20.) Devine saw Pinkston in a silver vehicle. (*Id.*, doc. p. 842.)

Inside a bedroom of the home, Pinkston closed the door and said to Devine, "Well, there's one more thing." (*Id.*, doc. p. 829.) He put on gloves, pointed a small chrome gun at her, and ordered her to the floor. (*Id.*, doc. pp. 829-30, 839.) When Devine asked if he was going to rape or kill her, he responded, "Neither. This is a robbery." (*Id.*, doc. p. 830.) Pinkston demanded money, but Devine repeatedly told him she did not have any. (*Id.*, doc. pp. 830-31.) After six to eight minutes in the bedroom, Pinkston peered out the door and saw another realtor and a client inside the house. (*Id.*, doc. pp. 831-32.) After Pinkston fled with Devine's phone and car keys, Devine used the other realtor's phone to call 911. (*Id.*, doc. pp. 832-33.)

Detective William Vickers responded and interviewed Devine. She described the perpetrator as a white male in his late forties to fifties, with a medium to slender build, weighing about 177 to 190 pounds, and with a salt-and-pepper goatee and sideburns. (*Id.*, doc. pp. 426-27.) Devine told Detective Vickers that he wore a fedora, a long-sleeve button-up shirt, dark slacks, and black shoes, and carried a black leather briefcase. (*Id.*, doc. pp. 426-27, 821.) Devine also said that he had a short-barreled handgun. (*Id.*, doc. p. 427.) Devine also noticed that he wore a wedding band. (*Id.*, doc. p. 827.)

The crimes occurred on Wednesday, June 3, 2015. (*Id.*, doc. pp. 340-41.) The next day, June 4, 2015, police showed both Devine and Goller a photo pack prepared based on a photo of an individual named Robert Evans. (*Id.*, doc. p.

5

507.) Neither victim identified anyone in the photo pack. (*Id.*) Goller and Devine together met with a detective to make a composite drawing. (*Id.*, doc. p. 346.) Goller largely deferred to Devine during this process because it became clear to her that Devine had a better view of the perpetrator. (*Id.*, doc. pp. 348-49.)

The police learned that a prepaid phone referred to as a TracFone was used to call the realtors on the day of the crimes. They obtained surveillance video of a man using cash to buy the TracFone at a Walmart in Pinellas Park, Florida, on May 11, 2015. (*Id.*, doc. pp. 476, 480, 489, 509-11.) On Friday, June 5, 2015, police released the Walmart surveillance video to news stations for the public's help in identifying the person in it. (*Id.*, doc. pp. 511-12, 836, 858.)

Pinkston was identified through a tip from Martin Robinson, his boss at a company called IRISS. (*Id.*, doc. pp. 559-61.) Robinson's wife saw the Walmart video on the news and told Robinson that it looked like Pinkston. (*Id.*, doc. pp. 562-63.) Robinson watched the video and "definitely thought" it was Pinkston. (*Id.*, doc. pp. 562-64.) On the news channel's website, Robinson listened to a voicemail left by the suspect and recognized Pinkston's voice. (*Id.*, doc. pp. 565-67.) A video of the suspect's vehicle showed a small silver SUV, and Robinson knew that Pinkston drove a silver Nissan Murano. (*Id.*, doc. p. 565.) Robinson was also aware that Pinkston had called in sick on June 3, 2015. (*Id.*, doc. p. 547.)

6

Cell phone data and mapping showed that the TracFone purchased at Walmart, Pinkston's work cell phone, and Pinkston's personal cell phone were pinging on cell phone towers that corresponded to the areas and times of the offenses. (*Id.*, doc. pp. 542, 666-712.)

Pinkston went to work on Monday, June 8, 2015. Sergeant Norman Smallen surveilled Pinkston beginning that morning. (*Id.*, doc. pp. 590-91.) Pinkston left for lunch that day, went to the bank, and returned to work. (*Id.*, doc. p. 596.) When he returned, Robinson observed that Pinkston had shaved his beard, which he had had throughout his employment, and kept only his mustache. (*Id.*, doc. pp. 570, 577-78.)

When officers arrested Pinkston later on June 8, 2015, they found a firearm in a black backpack. (*Id.*, doc. p. 594.) Police searched Pinkston's residence, where they found a hat and a badge. (*Id.*, doc. pp. 459-61, 473.) They also searched his vehicle, where they found handcuff keys in the center console and sunglasses in the glove compartment. (*Id.*, doc. pp. 464-65.) Police also recovered $2,000 in cash and black gloves from inside the vehicle. (*Id.*, doc. p. 468.) Police found a total of ten to twelve guns in the house, and one gun in the vehicle. (*Id.*, doc. pp. 471-72.)

The same day, June 8, 2015, Detective Daniel Cruz showed both victims a new photo pack that contained Pinkston's photo as photo number three. When Devine saw photo number three, she began to cry and shake and

identified it as the person who robbed her (*Id.*, doc. pp. 735, 739-40.) When Goller reviewed the second photo pack, she recognized photo number three as the person who was in the Walmart video, but did not identify him as the person who robbed her. (*Id.*, doc. pp. 343-44, 737.) Detective Cruz wrote down that Goller said she was "[u]nsure if the man in the video is the subject who was involved in this incident." (*Id.*, doc. p. 737.)

After Pinkston's arrest, Goller saw a second video showing him being escorted out of a door at the St. Petersburg Police Department by a detective with whom Goller had significant contact. (*Id.*, doc. p. 345.) When Goller saw Pinkston's height relative to the detective's height, as well as his gait, she was certain that he was the person who had robbed her. (*Id.*, doc. pp. 345-46.)

Pinkston testified at trial. He admitted that he was the person in the Walmart video. (*Id.*, doc. pp. 976-77.) He stated that he bought the TracFone in May because he was thinking about trying to meet a woman. (*Id.*, doc. p. 982.) He paid in cash because he did not want his wife to know. (*Id.*, doc. 977.) Pinkston testified that on May 30, 2015, he met a prostitute named Brittany in a city park and agreed to meet her again on June 3, 2015, at 7:30 a.m. (*Id.*, doc. pp. 978, 981 986-87.)

Pinkston stated that when he went to the park to meet Brittany on June 3, 2015, he had his backpack containing the TracFone, about $2,000 in cash, his passport, laptop, work cell phone, personal cell phone, and a firearm. (*Id.*,

8

doc. p. 989.) Pinkston testified that Brittany arrived with a man named Johnny. (*Id.*, doc. pp. 989, 994.) Brittany explained to Pinkston that Johnny was there to protect her. (*Id.*, doc. p. 991.) Pinkston testified he complied with Brittany's request to hand over his car keys and phone, and that Brittany gave them to Johnny, who was out in the park. (*Id.*, doc. p. 994.)

Pinkston testified that he and Brittany were in Brittany's van for several hours. (*Id.*, doc. p. 996.) When he exited the van, his vehicle and Johnny were gone. (*Id.*, doc. pp. 996-97.) By about 1:30 p.m., Pinkston and Brittany tracked down Johnny, who was driving Pinkston's SUV. (*Id.*, doc. p. 998.) Pinkston got his vehicle back and saw that his backpack appeared undisturbed. (*Id.*, pp. 1001-02.) But the TracFone was missing. (*Id.*, doc. p. 1006.) Pinkston testified that he recently told his wife, Carol Pinkston, about his meeting with Brittany. (*Id.*, doc. pp. 1018.) His wife, Carol Pinkston, testified that several weeks before trial, Pinkston told her about his infidelity. (*Id.*, doc. pp. 935-36.)

## II.   **STANDARD OF REVIEW UNDER SECTION 2254**

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The power of the federal courts to grant a writ of habeas corpus setting aside a state prisoner's conviction on a claim that his

conviction was obtained in violation of the United States Constitution is strictly circumscribed." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1093 (11th Cir. 2022).

Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), the phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This section "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *Id.* at 404. First, a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413.

10

Second, a decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). But the habeas court is "not limited by the

particular justifications the state court provided for its reasons, and [it] may consider additional rationales that support the state court's determination." *Jennings v. Sec'y, Fla. Dep't of Corr.*, 55 F.4th 1277, 1292 (11th Cir. 2022). When the relevant state-court decision is not accompanied with reasons for the decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 584 U.S. at 125. The state may "rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Id.* at 125-26.

For purposes of § 2254(d)(2), "it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question.'" *Brown v. Davenport*, 596 U.S. 118, 135 (2022) (quotations omitted). "An unreasonable determination of the facts occurs when the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but the petitioner's factual claim." *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1355 (11th Cir. 2020) (internal quotation marks and alterations omitted). A state court's findings of fact are presumed correct, and a petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Even where a petitioner succeeds in rebutting the presumption, he must show that the state court's decision is "based on" the incorrect factual determination. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022). This is because a state court decision may still be reasonable "even if some of the state court's individual factual findings were erroneous— so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id.* (quoting *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1224–25 (11th Cir. 2021) (Newsom, J., concurring)).

In addition to satisfying the deferential standard of federal court review of a state court adjudication, a federal habeas petitioner must exhaust his claims by raising them in state court before presenting them in a federal petition. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). A petitioner satisfies this exhaustion requirement if he fairly presents the claim in each appropriate state court and alerts that court to the federal nature of the claim. *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause

and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A petitioner shows cause for a procedural default when he demonstrates "that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). "A 'fundamental miscarriage of justice' occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id.*

## III.   STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL

Pinkston brings claims for ineffective assistance of trial counsel. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed, he must show both deficient performance by his counsel and prejudice resulting from those errors. *Id.* at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id.* at 688. A petitioner establishes deficient performance if "the identified acts or omissions

14

[of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

The second part requires showing that the deficient performance prejudiced the defense. *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal petitioners rarely prevail on claims of ineffective assistance of counsel because "[t]he standards created by *Strickland* and

15

§ 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## IV.   ANALYSIS

### A. Ground One

Pinkston contends that trial counsel was ineffective for allowing a sleeping juror to remain on the jury. During the testimony of State witness Detective Lisa Vanderbilt, the trial judge called the attorneys to the bench:

THE COURT: Please approach.

### (BENCH CONFERENCE.)

THE COURT: You know, it may be the case that he's writing, but I really cannot tell. But Juror Number 1 looks to me like he has been asleep for about the last hour.

MS. DENMON [Defense co-counsel]: He was doing it yesterday as well. [Assistant State Attorney] Mr. Riba and I noticed that – we couldn't tell if he was writing or if he was sleeping and kind of wake [sic] up. And then I think writes some stuff and then go [sic] back to sleep.

THE COURT: Well, I'm just bringing it to your attention in case it becomes something that you want to address later.

### (BENCH CONFERENCE CONCLUDED.)

(Doc. 15-3, Ex. 1a, doc. p. 509.)

Before closing arguments, the trial judge addressed the attorneys again:

THE COURT: [P]lease approach.

### (BENCH CONFERENCE.)

THE COURT: I just want someone to remind me, I thought I brought it to your attention that Juror Number 1 was sleeping for a great deal of the trial. No one has asked me to remove him, and I want to inquire of the Defendant if that's what he wants when the time comes.

MR. PEARLMAN [Lead counsel]: Can I place something on the record with this, Judge?

THE COURT: Sure.

MR. PEARLMAN: Since you pointed that out, I've watched him. Even when his eyes are "closed," he has at least 15 or 20 pages of notes.

THE COURT: In other words, he doesn't look like he's sleeping?

MR. PEARLMAN: I don't believe he – he looks like it. I actually think that's just part of what he does.

THE COURT: All right. I just want to be able to address it with your client.

MR. PEARLMAN: Yeah, absolutely.

### (BENCH CONFERENCE CONCLUDED.)

(*Id.*, doc. pp. 1058-59.)

The trial transcript contains no further discussion of a potentially sleeping juror.

The state court held an evidentiary hearing on Pinkston's ineffective assistance claim. The same judge who presided over the trial also presided over the postconviction proceedings. Lead trial counsel Lee Pearlman testified that he did not initially notice any issue with the juror, but that he began watching

17

the juror after the first bench conference. (Doc. 15-6, Ex. 8a, pp. 2681-82.) Pearlman testified that the defense table was close to the jury box, giving the defense a very clear view of the jury. (*Id.*, p. 2670.) He testified that he observed the juror close his eyes and put his head down before beginning to write notes, and that the juror wrote notes throughout the trial. (*Id.*, pp. 2670, 2689-90.)

Pearlman testified that he did not believe the juror was asleep, and that if he had, he would have sought the juror's removal. (*Id.*, pp. 2670-71, 2681, 2686.) Based on his experience of observing people during trials, Pearlman testified, he believed that the juror's behavior was like a "tic," and that the juror was not sleeping. (*Id.*, 2689-90.)

Pearlman also testified that the defense was satisfied with the jury and preferred this juror over the alternate. (*Id.* p. 2671.) Pearlman testified that he and co-counsel discussed the juror after the first bench conference and decided not to ask for his removal. (*Id.*) Pearlman testified that Pinkston discussed important matters with the attorneys during the trial and that he believed Pinkston was involved in the conversation about the juror. (*Id.*, p. 2684.) But because co-counsel was sitting between him and Pinkston at the defense table at the time, Pearlman testified, he did not have an independent recollection of discussing the juror with Pinkston. (*Id.*)

Co-counsel Nicole Denmon testified that she noticed the juror before the first bench conference, and that after the bench conference, she and Pearlman

18

watched the juror diligently. (*Id.*, p. 2693.) Denmon observed the juror taking notes and flipping pages, and it appeared to her that the juror was simply looking down or resting his eyes. (*Id.*) Denmon testified that she and Pearlman were pleased with the jury and did not want to replace this juror with the alternate. (*Id.*, pp. 2692-94.) Denmon testified that she would have sought the juror's removal if she thought that he was sleeping. (*Id.*, p. 2694.)

Denmon also testified that after the first bench conference, she talked to Pinkston about her and Pearlman's beliefs that the juror was not sleeping and was taking notes, and that the juror was preferable to the alternate. (*Id.*, pp. 2701-02.) Denmon recalled Pinkston deferring to the attorneys to decide whether to seek the juror's removal. (*Id.*, pp. 2704-05.)

Pinkston testified that he did not know that a juror might have been asleep. (*Id.*, pp. 2706-07.) Pinkston testified that Pearlman instructed him not to look at the jurors because doing so might make them uneasy. (*Id.*, pp. 2707-08.) Pinkston testified that he did not make any observations about the juror and never noticed that the juror might not be paying attention. (*Id.*, pp. 2710-11.) Pinkston testified that if he thought a juror was asleep or was not listening, he would have wanted the juror removed. (*Id.*, pp. 2708-10.)

The state trial court denied Pinkston's claim. After detailing the evidentiary hearing testimony and the parties' arguments, the state court found that counsel was not deficient and that Pinkston was not prejudiced.

19

(*Id.*, pp. 2624-26.) The state court found that counsels' determination that the juror was awake was reasonable in the light of their observations. (*Id.*, pp. 2626-27.) The state court cited the attorneys' testimony that they observed the juror closely after the first bench conference and saw that he was taking notes while his head was down; that they discussed the issue with each other and with Pinkston; that they concluded the juror was not asleep; that they would have asked that the juror been removed if they had thought he was sleeping; and that they were satisfied with the jury that was seated and did not want the alternate on the jury. (*Id.*)

The state court's order concluded that the attorneys "had a superior vantage point from which to view the juror" because their table was nearest to the jury box and they were "very close" to the juror. (*Id.*, p. 2627.) The state court also found that, although the judge's observations prompted the bench conferences, "[i]t was reasonable for counsel to trust their own close observations of the juror over the Court's equivocal suggestion that the juror might be sleeping." (*Id.*)

The state court summarized its findings on deficient performance, stating, "counsel considered making an objection but rejected that option after careful observation of the juror and consideration of which juror was best for [Pinkston's] case. This is a reasonable strategic basis to refrain from objecting

20

to the juror." (*Id.*, pp. 2627-28.) The state court also found the attorneys' testimony to be credible. (*Id.*, p. 2627.)

The state court reasonably determined that counsel's performance was not constitutionally deficient. Whether a witness is credible is a finding of fact that a petitioner can rebut only by clear and convincing evidence. *See Whatley v. Warden, Ga. Diagnostic and Classification Ctr.*, 927 F.3d 1150,1175-77 (11th Cir. 2019) (stating that "credibility-based determinations are findings of fact" that are presumed correct and that when a petitioner "challenges state court rulings that rest on findings of fact," he must "rebut the presumption of correctness . . . with clear and convincing evidence" (internal quotation marks and citations omitted)). Pinkston has not shown by clear and convincing evidence that the state court incorrectly found counsels' testimony credible.

Nor does Pinkston rebut the presumption of correctness afforded to the state court's finding that counsels' decision was strategic. *See Franks v. GDCP Warden*, 975 F.3d 1165, 1176 (11th Cir. 2020) ("The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct." (quoting *Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998))).

Counsel's strategic decisions "are entitled to a 'strong presumption' of reasonableness." *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (quoting *Richter*,

21

562 U.S. at 104). A strategic decision does not amount to ineffective assistance unless it is patently unreasonable. *See Dingle v. Sec'y, Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) (stating that counsel's strategic decision "will be held to have been ineffective assistance only if it was so patently unreasonable that no competent attorney would have chosen it" even when the decision "appears to have been unwise in retrospect") (citation omitted)); *Franks*, 975 F.3d at 1176 ("Because *Strickland* allows for a range of strategic choices by trial counsel, so too is there considerable leeway for state courts to determine the reasonableness of those choices. . . . For Franks to prevail, then, he would have to show that *no* reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct."). The state court did not unreasonably conclude that counsel made a reasonable strategic decision not to seek the juror's removal.

The state court also found that Pinkston failed to meet *Strickland*'s prejudice prong because he did not "show that the juror was sleeping during testimony." (Doc. 15-6, Ex. 8a, p. 2628.) Based on the evidentiary hearing testimony it deemed credible, the state court found that "while the juror may have lowered his head in a manner that appeared like sleeping, he was taking notes while doing so and was not, in fact, asleep." (*Id.*)

The state court's decision was reasonable. The state court's finding that the juror was not asleep is a factual finding that is presumed correct. Pinkston

22

has not rebutted, by clear and convincing evidence, the presumption of correctness afforded to this finding. *See* 28 U.S.C. § 2254(e)(1). Nor has he shown that his trial was rendered unfair because a juror slept through pertinent testimony. *See, e.g.*, *United States v. Fernandez-Hernandez*, 652 F.3d 56, 75 (1st Cir. 2011) ("A sleeping juror does not violate a defendant's due process rights unless the defendant can show he was prejudiced to the extent that he did not receive a fair trial.").

Pinkston does not show that the state court unreasonably determined that he failed to show a reasonable probability of a different outcome at trial had counsel sought the juror's removal. The state court did not unreasonably apply *Strickland* or base its decision on an unreasonable factual determination. Pinkston is not entitled to relief on Ground One.

### B. Ground Two

Pinkston argues that trial counsel was ineffective for failing to move to sever the charges involving Elaine Goller from the charges involving Ana Devine. Pinkston contends that trying these charges together prejudiced him because Devine's identification of him unfairly bolstered Goller's "unreliable" identification. (Doc. 10, pp. 24-25.) He asserts that "Goller's convictions were only obtained due to the joinder with Devine's case." (*Id.*, p. 24.)

The state trial court denied this claim, finding that Pinkston did not meet either prong of *Strickland*. The state court found that if counsel had filed

23

a motion to sever, "it would likely have been denied." (Doc. 15-5, Ex. 8, p. 55.) Under Florida law, the state court noted, two or more offenses are properly joined if they have a "meaningful relationship." (*Id.*) This sort of "meaningful relationship" exists when the crimes "occurred during a 'spree,' meaning that they were 'interrupted by no significant period of respite' or when the crimes are 'causally related to each other' in an episodic sense." (*Id.*); *see Smithers v. State*, 826 So.2d 916, 923 (Fla. 2002).

The state court found that the offenses satisfied the "meaningful relationship" test. The state court noted that the crimes occurred about an hour apart in nearby locations in St. Petersburg. (*Id.*, p. 56.) The state court also stated that in each instance, Pinkston called a female realtor using the same prepaid TracFone and alias; scheduled a real estate showing; wore "a straw hat and wraparound sunglasses"; carried a bag; threatened the realtor with a weapon; and demanded $50,000.00. (*Id.*, p. 56.)

Pinkston argues that the state trial court unreasonably determined the facts in finding a meaningful relationship between the offenses. Pinkston contends that there was a significant temporal break, that the offenses were not inextricably intertwined, and that "each case could have easily been tried separately without any prejudice to the State." (Doc. 10, p. 23.) Pinkston asserts that the state trial court would have been required under Florida law to grant a motion to sever.

24

Pinkston has not shown that the state court's decision was unreasonable. The state court's ruling that the identified similarities between the crimes established a "meaningful relationship" permitting joinder is a matter of state law to which this Court defers. *See Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017) (stating that, "although 'the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension,' [a federal court] 'must defer to the state's construction of its own law' when the validity of the claim that . . . counsel failed to raise turns on state law" (quoting *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984))).[3]

The state court also found that Pinkston failed to show prejudice. The state court concluded that even if a motion to sever was granted, "the evidence of each would have been admissible in the trial of the other as *Williams* rule evidence." (Doc. 15-5, Ex. 8, p. 56.) In Florida, the *Williams* rule "allows the State to introduce similar fact evidence of other crimes or acts by the defendant to prove a relevant matter in the prosecution for which he or she is on trial." *Newby v. State*, 272 So.3d 862, 869 (Fla. 2d DCA 2019) (citing *Williams v. State*,

---

[3] Goller testified that Pinkston demanded $50,000. (Doc. 15-3, Ex. 1a, doc. p. 331.) Devine testified that Pinkston did not specify the amount of money he wanted. (*Id.*, doc. p. 868.) Although the state court misstated that both victims testified Pinkston demanded $50,000, Pinkston has not shown that the state court's decision was "based on" an unreasonable finding of fact. *See Pye*, 50 F.4th at 1035.

25

110 So.2d 654 (Fla. 1959)). The state court found that *Williams* rule evidence likely would have been admitted due to the "distinct similarities between these two crimes" and the "sufficient evidence in the record to show by clear and convincing evidence that [Pinkston] committed the crimes against each victim." (*Id.*)

Pinkston asserts that the jury "certainly would not have convicted Goller with Devine as mere *Williams* rule evidence, nor vice versa" and that trying two cases together is "drastically different than merely using the other case as *Williams* rule evidence." (Doc. 10, p. 26); *see Tartarini v. State*, 84 So.3d 1185, 1190 (Fla. 1st DCA 2012) (addressing this difference and stating that "collateral crime evidence may not become a feature of trial and the defense is entitled to a limiting instruction on the collateral crimes evidence" (citation omitted)); *Roark v. State*, 620 So.2d 237, 240 (Fla. 1st DCA 1993) (stating that because collateral crime evidence may not become a feature, "[t]he amount of testimony which may be introduced as to the additional crime is thus limited, many times resulting in only the second victim being able to testify. No such limitation occurs when offenses are joined for trial, where all relevant evidence as to each crime being tried would be admissible").

But Pinkston only surmises that the outcome would have been different had the jury heard about the charges involving Ana Devine as *Williams* rule evidence. Even if, as suggested in *Roark*, Devine would have been the only

26

witness to testify about the events, Pinkston's allegations are too speculative to warrant federal habeas relief. Devine gave detailed and compelling testimony about the events and her observations of the perpetrator. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (stating that a petitioner's "unsupported allegations" that are "conclusory in nature and lacking factual substantiation" cannot sustain an ineffective assistance claim).

Pinkston has not shown that the state court's denial of his claim involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination. He is not entitled to relief on Ground Two.

### C. Ground Three

Pinkston asserts that trial counsel was ineffective for eliciting testimony that he invoked his right to counsel and his right to remain silent, refused to provide a DNA sample, and was paying off a $50,000.00 line of credit. He also contends that eliciting this testimony opened the door to the prosecutor making arguments "that would not have been otherwise admissible." (Doc. 10, p. 28.)

### 1. Pinkston's Silence During the Police Interview

Counsel asked Pinkston on direct examination about his police interview. Pinkston testified that he was in an interview room with officers, but that he "didn't know what it was about." (Doc. 15-3, Ex. 1a, doc. p. 1014.) Counsel then asked Pinkston:

Q   At a certain point do they begin to try to ask you questions?

27

A    No, not until later.

Q    How much later?

A    I don't remember the time. I don't remember the sequence and stuff. They asked me if I wanted some water. I said, Yeah, I'd like some water. But then they put my handcuffs back and I couldn't drink the water. So they put them in the front.

And then two plain clothes people came in. I assume they're detectives. And they probably told me, but I don't remember. I mean, I'm pretty scared. And they said, We're going to read you your Miranda.[4] And I know what that is because of my background.[5]

And so I'm trying to put this together and I'm thinking, Why am I here? And I thought I really don't want to get into any more without a lawyer. And so I told them – they read me all the stuff. I signed it. And then they said, Do you want to say anything? And I said, No. I'd like to see a lawyer. And that was it.

Q    So did they ever ask you for a DNA swab and you refused?

A    No. I didn't understand that. I never refused anything.

Q    Okay. So you said, I would like a lawyer. They stopped talking to you, right?

A    Yeah. They did exactly what they're supposed to.

Q    Then they sent you right over to jail?

A    Yeah.

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[5] Pinkston appears to have referenced his background as a marksmanship instructor who taught law enforcement officers. (Doc. 15-3, Ex. 1a, doc. p. 972, 975-76.)

(*Id.*, pp. 1015-16.)

Pinkston contends that counsel's eliciting this testimony "suggested to the jury that [Pinkston] must be guilty since he refused to speak to law enforcement." (Doc. 10, p. 36.) Pinkston argues that the prosecutor "took advantage of the opportunity" presented by this testimony to imply his guilt and attack his credibility on cross-examination and in closing arguments. (*Id.*, p. 30.)

On cross-examination, the prosecutor elicited Pinkston's testimony that he could have presented his version of events during the police interview, but that he chose not to do so. (Doc. 15-3, Ex. 1a, doc. p. 1030.) In closing arguments, the prosecutor similarly asserted that Pinkston had never shared his version of events earlier, even though he could have during the interview. (*Id.*, doc. p. 1173.)

The state court found that Pinkston failed to meet either prong of *Strickland*. It found that Pinkston volunteered additional information and "relayed a detailed answer beyond what counsel asked, explaining that he was given a *Miranda* warning and that he refused to answer questions and asked for a lawyer." (Doc. 15-5, Ex. 8, pp. 57-58.) That Pinkston volunteered this information, the state court found, did not render counsel deficient. (*Id.*, p. 58.)

29

The state court also ruled that Pinkston was not prejudiced. It concluded that Pinkston's testimony was mitigated by his explanation that he wanted an attorney because he did not know why he was at the police station. (*Id.*, p. 58.) The state court also found that Pinkston's version of events was "highly improbable" and that there was "a large enough amount of evidence against [Pinkston] that it is unlikely his testimony that he asserted his right to an attorney made any difference." (*Id.*, pp. 58-59.)

Pinkston argues that the state court unreasonably found that counsel performed adequately. He alleges that counsel knew he had invoked his rights during the interview and, therefore, should have known that questioning Pinkston about the interview would likely result in harmful testimony.

Pinkston has not shown that the state court's decision was unreasonable. Counsel asked Pinkston whether and when police questioned him, not whether he answered the questions or sought an attorney. (Doc. 15-3, Ex. 1a, pp. 1015-16.) Pinkston does not explain how counsel should have known that he would have gone beyond the scope of the questions and disclosed information that he now characterizes as "harmful." Pinkston's allegations that counsel should have known that he would go off topic are conclusory and self-serving.

Additionally, the state court found that the record refuted any claim that counsel should have objected to the prosecutor's closing argument. When the prosecutor asserted that Pinkston decided not to tell his story when he had a

30

chance to do so at his police interview, the state trial court called a bench conference. (Doc. 15-3, Ex. 1a, doc. p. 1173.) The state trial court agreed with counsel's assertion that this argument improperly shifted the burden to the defense. (*Id.*, doc. p. 1174.) Pinkston has not shown that the state court unreasonably decided the performance prong under the AEDPA standard. *See Tejada*, 941 F.2d at 1559.

Pinkston also contends that the state court unreasonably determined the facts in finding that he was not prejudiced. Pinkston contends that the evidence supporting Goller's identification of him "clearly was not overwhelming." (Doc. 10, p. 35.) Pinkston has not shown entitlement to relief. As Pinkston points out, Goller did not identify him as the person who robbed her from the photo pack or the Walmart video, and she did not immediately inform police when she did identify him from the police station video. But as the state court noted, the record shows that Goller testified she was certain of her identification when she viewed the police station video. (Doc. 15-3, Ex. 1a, doc. pp. 345-46.)

Moreover, the state court's prejudice finding was also based on evidence of Pinkston's guilt aside from Goller's identification. The state court listed incriminating evidence such as: Ana Devine's identification of Pinkston through a photo pack; Pinkston's admission to purchasing the TracFone that was used to call the victims; the voicemail Pinkston left at one of the realtor's

31

offices, which his employer recognized as his voice; cell-site location evidence showing that the TracFone, Pinkston's work phone, and Pinkston's personal cell phone were all near the crime scenes at the relevant times on June 3, 2015; Pinkston's missing work on June 3, 2015; and Pinkston's access to or possession of a straw hat, gloves, firearms, a handcuff key, a shirt, and a silver SUV, as well as a ring similar to the one Devine saw on the perpetrator. (Doc. 15-5, Ex. 8, p. 58) The state court also found that Pinkston's shaving his beard after news stations aired the Walmart video was evidence of consciousness of guilt. (*Id.*)

In analyzing prejudice, the state court also considered the effect of Pinkston's trial testimony, finding that "it was unlikely that the jury would have believed his testimony over the victims' even if he had not testified that he asserted his right to counsel" because "[i]t would be incredulous for [Pinkston] to give his keys, which allowed access to his SUV containing a firearm, $2,000, and electronics, to a stranger he believed was there to protect a prostitute." (*Id.*, pp. 58-59.) Additionally, the state court noted, there was evidence that Pinkston used the TracFone to leave a voicemail during the time he alleged he did not have his phone. (*Id.*, p. 59.) In the light of the overall evidence of guilt, the state court did not unreasonably find that Pinkston had not shown prejudice. The state court's decision did not involve an unreasonable

32

application of *Strickland*, nor was it based on an unreasonable factual determination.

### 2. Pinkston's Refusal to Provide a DNA Sample

Pinkston argues that counsel was ineffective when, during his cross-examination of Detective Tower, counsel elicited testimony that Pinkston refused to provide a DNA sample. Pinkston also alleges that the introduction of this evidence opened the door for the prosecutor to imply his guilt and attack his credibility. Pinkston argues that evidence of a refusal would not have been admissible absent counsel's alleged error in questioning Detective Tower.

Counsel asked Detective Tower on cross-examination:

Q    I want to be clear. Did you ensure that [Pinkston] had buccal swabs taken of him?

A    He didn't – he refused to do buccal swabs.

(Doc. 15-3, Ex. 1a, doc. p. 622.)

In closing arguments, the prosecutor addressed Detective Tower's testimony and Pinkston's testimony that he "never refused anything":

Law enforcement told you they asked him if he would provide a DNA sample, and he said no.

And then he told you – he took the stand and told you that, I was willing to. I was cooperative, of course. They never asked. . .

(*Id.*, doc. p. 1118.)

The state court denied Pinkston's claim on *Strickland*'s prejudice prong. (Doc. 15-5, Ex. 8, pp. 59-60.) The state court reiterated its finding that "there was a substantial amount of evidence against [Pinkston] and his alternate explanation of the day of the robberies was implausible." (*Id.*) Accordingly, the state court found that there was no reasonable probability of a different outcome had counsel not elicited Detective Tower's testimony that Pinkston refused to provide his DNA. (*Id.*, p. 60.)

Pinkston has not shown entitlement to relief. As addressed, the State presented significant evidence of Pinkston's guilt. And the state court did not unreasonably conclude that his version of events was "implausible." Additionally, the jury heard that the police investigation failed to uncover Pinkston's DNA or fingerprints. (Doc. 15-3, Ex. 1a, doc. pp. 631-32.) Thus, Pinkston has not shown that, absent the testimony of Detective Tower and the State's reference to it in closing arguments, there is a reasonable probability that the outcome of trial would have been different. The state court did not unreasonably apply *Strickland* or unreasonably determine the facts in denying this claim.

### 3. Testimony About a $50,000 Line of Credit

Pinkston argues that counsel was ineffective for eliciting testimony from his wife, defense witness Carol Pinkston, that he was making payments on a $50,000.00 line of credit issued to the Pinkstons' business. Pinkston argues

that he was prejudiced because this testimony provided a possible motive for the robberies "where there was previously not one," and because the prosecutor's reference to the loan on cross-examination "made it appear as if he could not obtain the money." (Doc. 10, pp. 39-40.)

The state court found that Pinkston failed to show prejudice from counsel's performance. The state court again cited the evidence of guilt, finding that "the weight of the evidence was already strongly against" Pinkston. (Doc. 15-5, Ex. 8, p. 60.) The state court also found that there was "ample evidence" that Pinkston had access to "substantial amounts" of money and that the loan payments could be made from the money generated by his business. (*Id*.) Thus, the state court found that the line of credit issued to the Pinkstons' business was "weak evidence" of a motive, and noted that motive was not an element of any crime with which he was charged. (*Id*.) The state court concluded that there was not a reasonable probability of a different outcome at trial had counsel not elicited information about the line of credit. (*Id*.)

The state court's decision was not unreasonable. Pinkston asserts that the state trial court failed to recognize that "motive is always a consideration in a financial crime." (Doc. 10, p. 40.) Although motive certainly can be relevant, the state court did not unreasonably conclude that any motive suggested by evidence of the line of credit was weak.

Carol Pinkston testified to the couple's finances on direct examination. She testified that they moved to St. Petersburg from Pennsylvania, where Pinkston started a company called Mountain State Contracting. (Ex. 15-3, Ex. 1a, doc. pp. 916-17, 921.) Carol Pinkston stated that she received a $90,000 salary from Mountain State and a $20,000.00 pension from another former employer. (*Id.*, doc. pp. 912, 918.) Carol Pinkston testified that Pinkston's base salary from IRISS was about $130,000 and that he could earn more through commissions. (*Id.*, doc. p. 923.) She also testified that the couple's monthly income was approximately $15,800.00. (*Id.*, doc. p. 925.)

Carol Pinkston testified that they made about $90,000 from the sale of their home in Pennsylvania and had received another $90,000 from leasing the oil and gas rights on a different property that they still owned there. (*Id.*, doc. pp. 921-22.) She testified that she and Pinkston had about $200,000 in savings. (*Id.*, doc. pp. 925-26.) As Pinkston notes, she testified on cross-examination that she would have noticed if Pinkston had taken money from their accounts. (*Id.*, doc. p. 965.)

Carol Pinkston also testified that the $50,000 line of credit was issued to Mountain State, that Mountain State's income was always used to make payments, and that the Pinkstons' personal and business finances were always entirely separate. (*Id.*, doc. pp. 919-21.) Based on Carol Pinkston's testimony, as well as Pinkston's consistent testimony about their finances, counsel argued

36

to the jury that Pinkston was financially sound and had no reason to commit robbery. (*Id*, doc. pp. 1155-57.)

In the light of this testimony and counsel's related argument to the jury, as well as the significant evidence of guilt, the state court did not unreasonably conclude that Pinkston failed to show prejudice from testimony about the line of credit. Carol Pinkston's acknowledgment that Pinkston could not have accessed any of their funds without her noticing—apparently suggesting that he might have had a motive to obtain money from another source—is too speculative to change the outcome of the prejudice prong. Pinkston has not shown that the state court's decision involved an unreasonable application of *Strickland* or was based on an unreasonable factual finding. He is not entitled to relief on Ground Three.

### D. Ground Four

Pinkston contends that trial counsel was ineffective for failing to call Dr. Ronald Fisher as an expert witness to testify about memory, suggestiveness, recall, and misidentification. Pinkston contends that Dr. Fisher would have testified "to the tainted and flawed" identifications. (Doc. 10, p. 40.)

Pinkston alleges that Dr. Fisher would have testified that the victims' identifications could have been influenced by viewing the Walmart video, and that Goller's viewing him in the police station video from which she identified him was highly suggestive. Pinkston also asserts that Dr. Fisher would have

37

testified that Officer Skinner could have influenced Goller's identification. Further, Pinkston alleges, Dr. Fisher would have testified that the "filler" photos in the photo pack were different enough from Pinkston's photo to increase the likelihood of a false identification.

The state court found that Pinkston was not prejudiced by counsel's performance. (Doc. 15-5, Ex. 8, p. 61.) The state court found that "a substantial amount of other evidence" corroborated the victims' identifications and that counsel "effectively argued the issues with the victims' identifications without use of an expert." (*Id.*) The state court therefore concluded that there was not a reasonable probability that the outcome of trial would have been different had counsel called an expert to testify that the identification of Pinkston was unreliable. (*Id.*)

Pinkston's assertion that the state court's decision was unreasonable because identification "was a genuine issue in the case" does not entitle him to relief (Doc. 10, p. 41.) As the state court found, counsel cross-examined the victims and law enforcement witnesses regarding the identification process and argued to the jury that the identification was unreliable.

Under counsel's questioning, Goller conceded that the hat, sunglasses, and gun entered into evidence by the State did not appear to her to be the ones used by the person who robbed her. (Doc. 15-3, Ex. 1a, doc. pp. 355-58.) Goller also testified that she did not recall any facial hair on her attacker and agreed

38

that she did not participate much in creating the police sketch. (*Id.*, doc. pp. 362-66.) On cross-examination, Detective Tower testified that Goller's observations were limited, and that she thought the perpetrator was clean-shaven. (*Id.*, doc. pp. 630-31.)

Goller also acknowledged on cross-examination that she had repeatedly seen the Walmart video on the news before police showed her the photo pack containing Pinkston's image. (*Id.*, doc. pp. 368-69.) Further, Goller reiterated that when she saw the photo pack, she recognized photo number three as the person in the Walmart video but was unsure at that time if it was the same person who robbed her. (*Id.*, doc. pp. 370-71.) On cross-examination, Detective Cruz likewise testified that when he showed her the photo pack, Goller did not identify Pinkston as the person who robbed her. (*Id.*, doc. pp. 737-38.) Goller agreed that she saw this photo pack before she saw the police station video from which she identified Pinkston. (*Id.*, doc. pp. 372-73.)

On cross-examination, Ana Devine testified that she was unsure if the hat recovered from Pinkston's home was the same hat worn by the perpetrator. (*Id.*, doc. pp. 843-44.) Counsel also elicited Devine's testimony that Pinkston's photo in the photo pack looked like the person on the Walmart video. (*Id.*, doc. pp. 861-62.)

Pinkston has not shown that the state court unreasonably concluded that counsel effectively cross-examined the witnesses without utilizing Dr.

Fisher. He elicited testimony from the victims and law enforcement that raised potential concerns about the identifications.

Pinkston notes that he provided the state court with a copy of Dr. Fisher's CV. But Pinkston does not state, and it does not appear from the record before this Court, that he provided the state court with evidence of how Dr. Fisher would have testified about the identifications in this specific case. Without such information, Pinkston's claim is too speculative to warrant federal habeas relief. *See Shaw v. United States*, 729 F. App'x 757, 759 (11th Cir. 2018) ("[The Eleventh Circuit has] stated that complaints about uncalled witnesses are not favored, because the presentation of testimony involves trial strategy and 'allegations of what a witness would have testified are largely speculative.' " (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978))); *Streeter v. United States*, 335 F. App'x 859, 864 (11th Cir. 2009) ("In a habeas petition alleging ineffective assistance of counsel, mere speculation that missing witnesses would have been helpful is insufficient to meet the petitioner's burden of proof." (citing *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001))).

Pinkston has not shown that the state court unreasonably applied *Strickland*'s prejudice prong or unreasonably determined the facts in denying his argument. Pinkston is not entitled to relief on Ground Four.

40

### E. Grounds Five, Eight, and Nine

Grounds Five, Eight, and Nine involve the victims' identification of Pinkston. Pinkston filed an unsuccessful pretrial motion to suppress their out-of-court identifications and prevent in-court identifications.

### 1. Ground Nine

Pinkston argues that the trial court erred in denying his motion to suppress Devine's identification. Pinkston argues that the procedure used to obtain the identification was unnecessarily suggestive because Devine saw the Walmart video twice, including once at the police station, before she was shown the photo pack from which she identified Pinkston.

The state trial court denied Pinkston's motion after a suppression hearing. Devine testified that when she arrived for the showing, she suddenly had a "very negative feeling" that "something was not right," which caused her to pay more attention to Pinkston. (Doc. 15-2, Ex. 1, p. 97.) She described the clothes he was wearing and his black briefcase. (*Id.*, p. 98.) Devine testified that when she realized that she "was not there to sell [the] home," she began trying to memorize details about Pinkston, including his sideburns and goatee and his "wide" wedding ring. (*Id.*, pp. 98-100.) Devine testified that she was with Pinkston for about twelve to fifteen minutes and that she was "face-to-face" with him. (*Id.*, pp. 101, 103.)

41

Devine also described the gun she saw Pinkston use and had "no doubt" that the gun the State presented at the hearing was the same one. (*Id.*, pp. 102-03.) She was similarly "absolutely" certain that the sunglasses, shirt, and wedding ring introduced at the hearing were the ones that Pinkston was wearing. (*Id.*, pp. 105-07.) Devine testified that she identified Pinkston from the photo pack Detective Cruz showed her on June 8, 2015. (*Id.*, p. 111.)

In denying Pinkston's motion to suppress, the state court rejected his argument that the public release of the Walmart video was impermissibly suggestive because it would later taint Devine's identification. (Doc. 15-2, Ex. 1, p. 137.) The state court found that releasing the video was an "investigative tool," not part of the identification process. (*Id.*, pp. 137-38.) The state court concluded that the identification did not involve an impermissibly suggestive procedure, and that there was no substantial risk of misidentification. (*Id.*, p. 141.)

Pinkston contends that the state court erred in finding that the video created no substantial likelihood of misidentification. Pinkston also argues that the state trial court unreasonably found that Devine only "briefly" saw the media coverage.

Pinkston has not shown entitlement to relief. An identification procedure violates due process when it (1) is unnecessarily suggestive and (2) creates a substantial risk of misidentification. *Neil v. Biggers*, 409 U.S. 188 (1972). But

42

a suggestive identification process "does not – by itself – violate due process." *Williams v. Warden*, 814 F. App'x 477, 479 (11th Cir. 2020) (citing *Biggers*, 409 U.S. at 196). When the identification procedure is suggestive, "[t]he pertinent question is "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." *Williams*, 814 F. App'x at 479 (quoting *Biggers*, 409 U.S. at 196).

In determining the reliability of an identification made after a suggestive procedure, a court considers: "(1) the eyewitness's opportunity to view the suspect; (2) her degree of attention; (3) the accuracy of her description; (4) her level of certainty; and (5) the length of time between the crime and her identification." *United States v. Caldwell*, 963 F.3d 1067, 1075 (11th Cir. 2020) (citations omitted).

Pinkston has failed to show that the state court unreasonably found that publicly releasing the video was not impermissibly suggestive because it was a common investigative tool and not part of the identification process. Additionally, the reference to Devine having "briefly" seen the video, even if inaccurate, was only mentioned in the state court's summary of her suppression hearing testimony. (Doc. 15-2, Ex. 1, p. 135.) A reference to Devine "briefly" viewing the video was not mentioned, much less relied upon, in the state trial court's analysis. (*Id.*, pp. 136-41.)

But even if Pinkston had shown that the identification procedure was unnecessarily suggestive, he fails to establish a substantial risk of misidentification. As Pinkston states, Devine's observations of the perpetrator were limited to the extent that he wore sunglasses and a hat. (*Id.*, p. 119.) But Devine's testimony, when considered under the factors listed in *Caldwell*, supports the state court's finding that there was no substantial risk of misidentification. Devine had an opportunity to view Pinkston for twelve to fifteen minutes, and they were "face-to-face." She made a point to study him and memorize details about him because she was wary of him, and there was no indication that her description was inaccurate. Devine was certain about the photo pack identification she made on June 8, 2015, five days after the crime occurred on June 3, 2015. Devine also testified at the suppression hearing that she was "absolutely not" influenced by the Walmart video in identifying Pinkston. (Doc. 15-2, Ex. 1, p. 113.) Based on this testimony, the state court reasonably determined that Devine's identification of Pinkston was reliable and that the process did not result in a substantial risk of misidentification.

Pinkston has not shown that the state court unreasonably applied clearly established federal law or based its decision on an unreasonable factual determination. He is not entitled to relief on Ground Nine.

## 2. Ground Five

Pinkston contends that trial counsel was ineffective in presenting his argument to suppress Goller's identification. In the motion to suppress, counsel argued that Goller's identification was tainted by viewing the videos of Pinkston on the news. He contended that the second video of Pinkston being led from the police department amounted to an "inherently suggestive" "police station show-up." (Doc. 15-2, Ex. 1, pp. 35-36.) Counsel argued that Goller's identification also lacked reliability because she was not certain that the photo she chose from the photo pack was the perpetrator.

Pinkston contends that counsel should have more specifically argued that Goller informed the police of her identification "only after Officer Skinner suggestively informed her that [Pinkston] was not being charged in her case because she could not identify him as the assailant," but that he had been arrested in Devine's case. (Doc. 10, pp. 47-48.) After these remarks, Pinkston alleges, Goller "suddenly informed the officer" that she could identify Pinkston through the police station video that she saw earlier. (*Id.*, p. 48.)

Additionally, Pinkston alleges that trial counsel was ineffective for failing to call Officer Skinner or Dr. Fisher at the suppression hearing. He alleges that Officer Skinner would have testified that he informed Goller that police were pursuing Devine's case but could not pursue Goller's case because she did not identify Pinkston. (Doc. 10, p. 49.) He alleges that Dr. Fisher would

45

have testified that this communication from Officer Skinner "was highly suggestive and could have influenced her identification." (*Id.*)

The state court denied Pinkston's ineffective assistance claim. It found that if trial counsel had presented this argument, neither the outcome of the motion to suppress nor the outcome of the trial would have changed. (Doc. 15-5, Ex. 8, p. 61.)

Goller testified at the suppression hearing that she saw the Walmart video before Detective Cruz showed her the photo pack on June 8, 2015. (Doc. 15-2, Ex. 1, p. 72.) She testified that she identified one of the photos as the person she saw in the Walmart video. (*Id.*) Goller testified that she could not identify the person in the photo as the one who robbed her because the picture did not show him wearing sunglasses or a hat. (*Id.*, p. 74.) Later, Goller saw media coverage of Pinkston's arrest. Specifically, she saw a video of his being led out of the police department. (*Id.*, pp. 75-76.) Goller testified that in this video, she could tell that Pinkston's height and body shape of the subject matched the person who robbed her. (*Id.*, pp. 74-76.)

Goller's trial testimony was consistent with this suppression hearing testimony. (Doc. 15-3, Ex. 1a, doc. pp. 343-46.) She explained that the police station video gave her a "point of reference" regarding Pinkston's size that the Walmart video had not, and that after seeing his size and "how he moved," she was "certain they had arrested the right person." (*Id.*, doc. p. 345.) She later

46

told an officer, after having seen the police station video, that she was certain it showed the person who robbed her. (*Id.*, doc. pp. 345-46.)

As the state court appeared to recognize in its order, it was unclear if record evidence detailed the alleged conversation between Officer Skinner and Goller. The motion to suppress alleged that "an officer" made suggestive remarks to Goller. (Doc. 15-2, Ex. 1, p. 37.) Officer Skinner did not testify at the suppression hearing. And although the state court docket appears to show that Officer Skinner's deposition was filed on February 17, 2016, shortly before the suppression hearing took place on February 26, 2016, his deposition testimony was not referenced during the excerpted portions of the hearing that were transcribed or in the state trial court's order. (Doc. 15-2, Ex. 1, pp. 10, 52-126.)

The state court concluded that the "alleged conversation" between Officer Skinner and Goller did not "demonstrate an unnecessarily suggestive procedure." (Doc. 15-5, Ex. 8, p. 61.) Rather, the state court found, Officer Skinner was informing Goller of the status of the case—a "necessary part of the criminal justice system." (*Id.*); *see* Art. I, § 16, Fla. Const. (addressing a crime victim's rights to be informed during criminal justice proceedings).

The state court further found that Pinkston had not alleged that Officer Skinner did anything to prompt Goller to identify Pinkston and that it appeared she "simply volunteered the identification." (*Id.*) Additionally, the

47

state court found that the procedure did not "give rise to any likelihood of misidentification" because Goller testified that she was sure that Pinkston was the perpetrator when she saw him on media coverage prior to talking to Officer Skinner. (*Id.*, pp. 61-62.) Finally, the state court found, counsel "did briefly refer to these circumstances" in the motion to suppress. (*Id.*, p. 62.)

Pinkston has not shown that this decision was unreasonable. The state court did not unreasonably find that counsel's motion to suppress raised the question of Officer Skinner's role in the identification proceeding. Counsel argued that even though Goller identified Pinkston from the police station video, she did not inform police of this identification until after an officer told her that Devine had positively identified Pinkston as the perpetrator, "at which point Ms. Goller insisted that her identification was certain." (Doc. 15-2, Ex. 1, p. 37.) Thus, counsel did bring this matter before the state trial court.

Further, Pinkston has not shown that the state court unreasonably found that Officer Skinner was informing Goller of the case status, or that this alleged conversation was not unduly suggestive, as Goller had already identified Pinkston from the police station video. Again, Goller testified consistently at the suppression hearing and at trial that she identified Pinkston when she saw the police station video and that she was confident in this identification.

Pinkston has not shown that the state court unreasonably ruled that there was no reasonable probability of a different outcome had counsel raised it more forcefully in the motion to suppress. Having failed to show that the state court's decision involved an unreasonable application of *Strickland* or was based on an unreasonable factual finding, Pinkston is not entitled to relief on Ground Five.

### 3. Ground Eight

Pinkston argues that trial counsel was ineffective for not objecting to Goller's in-court identification at trial because the identification was not based on her independent recollection. Pinkston notes that Goller testified at trial that she identified him on the police station video by his walk and height. But when she testified at trial and identified him in the courtroom, Pinkston asserts, Goller could see only his face, not his walk or his height.

The state court found that an objection to Goller's in-court identification would have been denied. (Doc. 15-5, Ex. 8, p. 65.) The state court found that Goller's limited view of the perpetrator due to his hat and sunglasses, and her identifying the photo as the person in the video, not the person who robbed her, did not make her identification inadmissible. (*Id*.) The state court also noted that Goller had an opportunity to observe the perpetrator during the crime. (*Id*.) The state court concluded that Pinkston did not present any authority other than his "blanket statement that the identification was unfair." (*Id*.)

49

The state court's ruling was not unreasonable. Because this ineffective assistance claim rests on an application of Florida evidentiary law, this Court must defer to the state court's decision. *See Pinkney*, 876 F.3d at 1295. Pinkston has not shown that this ruling involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination. He is not entitled to relief on Ground Eight.

**F. Ground Six-A**

Pinkston argues that trial counsel was ineffective for failing to object to a portion of Detective Tower's testimony that improperly conveyed his opinion of Pinkston's guilt and suggested that police had additional evidence of guilt not presented at trial.

The prosecutor questioned Detective Tower about the information that led police to identify Pinkston as the suspect:

Q:   Detective, you had mentioned, you know, the phone number. You mentioned the cell phone records. In addition to this, you had the identification from Ana Devine?

A:   Correct.

Q:   And also the identification of Mr. Pinkston's employer of the video from Walmart of him purchasing that TracFone?

A:   That's correct.

Q:   That in addition to all of the other matches that you had along the way that pointed all the fingers towards Mr. Pinkston?

50

A:    Yes. That's correct.

Q:    And as you were conducting this investigation, obviously, you were following up on other leads that, you know, people had called in and tried to give *Crime Stopper* tips; is that correct?

A:    That's correct.

Q:    And did any of the evidence that come out to you point to any of those people?

MR. PEARLMAN:
Judge, I'm going to object at this point. I think now we're basing this on hearsay.

THE COURT:
Sustained.

BY [THE PROSECUTOR]:
Q:    As this investigation unfolded, did you have by the time you get to June 8th of 2015, the information that you had then, did you have any reason to look to anybody other than Paul Pinkston?

A:    No, we did not.

(Doc. 15-3, Ex. 1a, doc. pp. 637-39.)

The state court denied Pinkston's claim, finding that counsel was not deficient and that Pinkston was not prejudiced. (Doc. 15-5, Ex. 8, p. 62.) The state court found that the prosecutor did not ask Detective Tower for his opinion of Pinkston's guilt, nor did the questions suggest the existence of additional evidence against Pinkston. (*Id.*, p. 62.)

Rather, the state court found that Detective Tower was explaining the evidence that had been developed (Id.). The state court found that "[i]n context," the State was responding to "counsel's tactic of attempting to show that the police had made a rushed, incomplete investigation, particularly in regard to the lack of DNA or fingerprint evidence." (*Id.*) The state court found that the questions were proper to "rebut counsel's argument that the police were rushing to pin the case on [Pinkston] due to media attention." (*Id.*)

Pinkston argues that the state court's finding was unreasonable because Detective Tower's testimony, although elicited "under the guise of unfolding the investigation, . . . was designed solely to improperly inform the jury that the officer believed that Pinkston was the assailant." (Doc. 10, pp. 51-52.) Pinkston also argues that the prejudice was more pronounced because the testimony came from a law enforcement officer.

Pinkston has not shown that the state court unreasonably ruled that Detective Tower was not asked for, and did not give, his opinion of Pinkston's guilt. The record supports the state court's finding that his testimony instead reflected that evidence gathered by police was connected to Pinkston. Additionally, as the state court noted, the defense contended that the investigation was cursory and that Pinkston was merely a convenient suspect. For instance, counsel stated that Pinkston's DNA and fingerprints were not found at the crime scenes, and that his computers had not been searched for

52

information about properties or real estate. (Doc. 15-3, Ex. 1a, doc. pp. 290-91.)

Counsel asserted that police needed a suspect to focus on, and that once they

identified Pinkston, who was "in the wrong place at the wrong time," police

simply "wanted him to fit." (*Id.*, doc. pp. 286, 292.)

Thus, the state court did not unreasonably find that the questioning was

intended to counter this defense theory by showing that the police suspected

Pinkston because the evidence pointed to him. Moreover, this Court must defer

to the state court's ruling of state evidentiary law that such questions were

proper to rebut the defense theory. *See Pinkney*, 876 F.3d at 1295.

To the extent that Pinkton argues that he was prejudiced because the

testimony came from an officer, the state court instructed the jurors that a

witness's "title alone cannot confer credibility. The credibility comes from what

you believe and how that witness has testified on the stand." (Doc. 15-3, Ex.

1a, doc. p. 37.) Jurors are presumed to follow the trial court's instructions. *See

United States v. Grushko*, 50 F.4th 1, 15 (11th Cir. 2022). Finally, as addressed,

the prosecution presented significant evidence of Pinkston's guilt. The state

court did not unreasonably find that Pinkston was not prejudiced by counsel's

performance. Because Pinkston has not shown that the state court

unreasonably applied *Strickland* or based its decision on an unreasonable

finding of fact, he is not entitled to relief on Ground Six-A.

**G. Ground Six-B and Ground Ten**

Ground Six-B and Ground Ten both involve the Florida evidentiary question of reverse *Williams* rule evidence. In Florida, "[t]he reverse *Williams* rule is simply the application of *Williams* rule principles to the circumstance in which a defendant (rather than the State) seeks to introduce evidence of similar crimes committed by another person (rather than the defendant) to show that the defendant did not commit the offense for which he or she is being tried." *Newby*, 272 So.3d at 869.

**1. Ground Six-B**

In Ground Six-B, Pinkston argues that counsel should have attempted to "remedy the error" of Detective Tower's opinion testimony by moving to introduce reverse *Williams* rule evidence about an offense allegedly committed by a man named Bruce Kotter. (Doc. 10, p. 50.) The State filed a pretrial motion in limine to exclude evidence that Kotter was arrested for luring a female realtor into a home and attempting to sexually batter her on August 10, 2015. (Doc. 15-2, Ex. 1, pp. 144-45.) The state trial court granted the State's motion. (*Id.*, pp. 157-61.)

On postconviction review, the state court found that counsel was not ineffective for failing to move to introduce this evidence in response to Detective Tower's testimony. (Doc. 15-5, Ex. 8, p. 63.) The state court found that the prosecutor's questioning of Detective Tower did not open the door to

introducing reverse *Williams* rule evidence. (*Id.*) Thus, the state court concluded, consistent with the state court's pretrial ruling excluding such evidence, counsel had no basis to seek its introduction. (*Id.*) The state court found that Pinkston was not prejudiced by counsel's failure to raise a meritless argument. (*Id.*)

Pinkston has not shown entitlement to relief. Whether counsel had a viable basis to seek the introduction of the identified reverse *Williams* rule evidence is a question of state evidentiary law. In considering this ineffective assistance claim, this Court must defer to the state court's determination that Detective Tower's testimony did not give counsel a basis to seek the introduction of this reverse *Williams* rule evidence. *See Pinkney*, 876 F.3d at 1295. As the state court found, counsel cannot be ineffective for not bringing a meritless claim. *See Thompson v. United States*, 826 F. App'x 721, 727 (11th Cir. 2020) ("[S]ince Thompson's argument has no merit, his trial counsel cannot be found ineffective for failure to raise a meritless argument." (citing *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001) and *United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992)).

Because he has not shown that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim, Pinkston is not entitled to relief on Ground Six-B.

### 2. Ground Ten

In Ground Ten, Pinkston asserts that the state trial court violated his due process rights by granting the State's motion in limine to exclude evidence about Kotter. Pinkston alleges that Kotter's description and the facts of his case were similar enough to warrant the introduction of reverse *Williams* rule evidence.

When the state trial court granted the State's motion in limine, it summarized the allegations against Pinkston and noted that the victims described him as a white male in his late forties to early fifties, standing approximately 5'5" to 5'6" tall and weighing approximately 175 pounds. (Doc. 15-2, Ex. 1, p. 159.) Again, the suspect used the name "Robert Evans," drove a silver vehicle, displayed a firearm during the crimes, and demanded money. (*Id*.) Both crimes occurred in Pinellas County. (*Id*.)

The state court noted that the victim in the other case described the perpetrator as a man in his fifties who stood approximately 6 feet tall and weighed about 250 pounds. (*Id*.) The other man used the name "Jim" and drove a black Ford 150 pickup truck. (*Id*.) The state court also noted that the offense with which Kotter was charged occurred in Manatee County, did not involve a weapon, and appeared to be motivated by rape, not robbery. (*Id*.)

The state court found that "the only actual similarities" between the allegations were that "a balding white male accosted a realtor after setting up

56

a showing of a property in west central Florida." (*Id.*) The state court concluded that "such limited connections" between the two cases did not warrant the introduction of reverse *Williams* rule evidence. (*Id.*, pp. 159-60.)

Pinkston has not shown entitlement to federal habeas relief. Pinkston argues that the trial court's ruling was unreasonable in the light of the facts presented. But the question of whether reverse *Williams* rule evidence was properly excluded is a matter of Florida evidentiary law. The scope of federal habeas review "is severely restricted." *Shaw v. Boney*, 695 F.2d 528, 530 (11th Cir. 1983). Thus, "[f]ederal courts reviewing habeas corpus petitions are not empowered to correct erroneous evidence rulings of state trial courts." *Smith v. Newsome*, 876 F.2d 1461, 1468 n.8 (11th Cir. 1989) (citation omitted).

Further, an error of state evidentiary law will warrant federal habeas relief only when the error renders the proceeding fundamentally unfair. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). "[To render a state-court proceeding fundamentally unfair, the excluded evidence must be material in the sense of a crucial, critical, highly significant factor." *Taylor v. Sec'y, Fla. Dep't of Corr.*, 760 F.3d 1284, 1296 (11th Cir. 2014); *see also Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (explaining that to obtain federal habeas relief based on an error in a state court proceeding, a petitioner must show that the error "had substantial and injurious effect or influence in determining the jury's verdict").

57

Pinkston has not met this standard. The exclusion of reverse *Williams* rule evidence about Kotter, even if incorrect under Florida law, did not render Pinkston's trial fundamentally unfair. Pinkston has not identified evidence beyond the general similarities listed in the state court's order to show that Kotter could have committed the crimes of which Pinkston was convicted. And as the state court pointed out, the perpetrator's appearance and alias, the vehicle involved, whether a weapon was used, and the apparent motive for the crimes were clearly distinguishable. Pinkston has not shown that excluding such evidence rendered his trial fundamentally unfair for purposes of federal habeas relief. He is not entitled to relief on Ground Ten.

**H. Ground Seven**

Pinkston argues that trial counsel was ineffective for failing to object several times during the trial.

**1. Closing Argument**

Pinkston contends that counsel was ineffective for not objecting to an improper prosecutorial comment during closing arguments. Pinkston concedes that counsel objected when the prosecutor called him a liar but argues that counsel should have objected to the prosecutor's next statements about his reliability as a witness. The prosecutor argued that Pinkston's testimony about "Johnny" was untrue when he stated:

[PROSECUTOR]: The guy never took my money, and they never took the cash that was in the backpack. Never took the gun. Never touched anything. Really? That, members of the jury, is a story told to you by a man who is an admitted liar.

MR. PEARLMAN: Objection, Your Honor.

THE COURT: Overruled.

[PROSECUTOR]: He is an admitted liar because he kept secrets from his wife. He did it intentionally. He didn't want his wife to know that he wasn't at work on June the 3rd. He has kept secrets.

Paul Pinkston is not the man Carol Pinkston married for [sic] 37 years. They were married for 37 years. They raised a child, successful child, traveled around the country to different jobs, were in the military together. And if he is willing to lie to her, what do you think he thinks of you? People he's never met before. What does that say about his credibility and the story that he tells? What should you all think about whether that story is true or not?

(Doc. 15-3, Ex. 1a doc. pp. 1167-68.)

Pinkston argues that counsel should have objected to the final paragraph of the above-quoted argument because "[t]his type of comment is irrefutably improper and highly prejudicial" and "plac[ed] [him] against the jury." (Doc. 10, pp. 54-55.)

The state court denied Pinkston's ineffective assistance claim, finding that counsel objected to "the first portion of this argument," but that the objection was overruled. (Doc. 15-5, Ex. 8, p. 63.) The state court also found that the comment, while "forceful, . . . was an argument on Defendant's credibility based on the evidence and was permissible." (*Id.*, p. 64.) The state

59

court ruled that counsel was not ineffective for declining to make a meritless argument. (*Id.*)

Pinkston asserts that the state court erred in finding that counsel objected. But it was not unreasonable for the state court to find that counsel objected to the "first portion" of the prosecutor's argument—that Pinkston admitted to lying. Further, Pinkston has not shown that counsel was ineffective for not immediately making another objection during the prosecutor's argument that Pinkston was not credible. *See, e.g., Huffman v. Sec'y, Dep't of Corr.*, 2025 WL 2172460, at *5 n.5, No. 8:23-cv-1700-WFJ-LSG (M.D. Fla. July 31, 2025) ("In light of these prior rulings, counsel's failure to rehash the same failed argument cannot be considered ineffective assistance of counsel." (quoting *United States v. Mena-Robles*, 4 F.3d 1026, 1034 (1st Cir. 1993))).

Nor has Pinkston shown that the state court unreasonably found that the prosecutor's comment was a permissible argument about Pinkston's credibility. A prosecutor may challenge a witness's credibility if supported by the evidence at trial. *See United States v. Baptiste*, 935 F.3d 1304, 1312-13 (11th Cir. 2019). Both Pinkston's testimony and Carol Pinkston's testimony supported the prosecutor's assertions that Pinkston lied to his wife. Even assuming that the prosecutor improperly suggested that Pinkston was now lying to the jury, Pinkston has not shown resulting prejudice. In the light of

60

the significant evidence of guilt, Pinkston has not shown a reasonable probability—that is, one "sufficient to undermine confidence in the outcome"—that the outcome of the trial would have been different had counsel objected. *Strickland*, 466 U.S. at 694; *see also Lucas v. Warden, Ga. Diagnostic and Classification Prison*, 771 F.3d 785, 804 (11th Cir. 2014) (stating that an improper prosecutorial remark does not violate the Constitution unless it "so infected the trial with unfairness as to make the resulting conviction a denial of due process" (internal quotation marks and citation omitted)). Pinkston fails to show that the state court's decision involved an unreasonable application of *Strickland* or was based on an unreasonable factual finding, and he fails to establish any prejudice.

### 2. Badge Recovered from Pinkston's Home

Pinkston argues that counsel was ineffective for failing to object when a crime scene technician testified that a badge was recovered from Pinkston's home. (Doc. 15-3, Ex. 1a, doc. p. 473.) Pinkston contends that, because handcuffs were used during the crimes, the jury could "only draw a negative inference" that he used the badge to impersonate a police officer. (Doc. 10, p. 55.)

The state court denied this argument as "entirely speculative." (Doc. 15-5, Ex. 8, p. 64.) The state court noted that Pinkston did not allege that the State or anyone else had argued that Pinkston was impersonating an officer, that

there was no testimony alleging that he did so, and that the testimony about the badge did not specify that it was a law enforcement badge. (*Id.*) Further, the state court found, there was "ample evidence that [Pinkston] had a law enforcement background." (*Id.*) The state court therefore found that the jury "could just have easily concluded" that a badge was related to Pinkston's law enforcement history or was not a law enforcement badge. The state court concluded that Pinkston's speculative claim did not warrant relief. (*Id.*)

The state court's ruling was not unreasonable. There was no argument or allegation that Pinkston had impersonated an officer, and there were other plausible explanations for the badge's presence in his home. Further, the jury's impression of one witness's isolated reference to having found a badge is entirely speculative, as the state court found. *See Tejada*, 941 F.2d at 1559. The state court did not unreasonably deny Pinkston's ineffective assistance claim.

### 3. Hearsay Testimony

Pinkston argues that counsel was ineffective for failing to object to his boss, Martin Robinson's, hearsay testimony. Pinkston alleges that Robinson testified that his wife also identified Pinkston from the televised Walmart video, and that another employee, Mr. Anderson, also noticed that Pinkston shaved his goatee at lunch on Monday, June 8, 2015.

62

The state court denied this claim. It stated that Robinson "did not testify that his wife identified [Pinkston]; he testified that he was watching television with his wife and that he believed that he recognized [Pinkston]" in the Walmart video. (Doc. 15-5, Ex. 8, p. 64.) The state court also noted that when Robinson testified that Anderson noticed that Pinkston shaved at lunch, counsel objected, and the objection was sustained. (*Id.*) The state court concluded that Pinkston was not prejudiced by any hearsay before the objection because whether Pinkston shaved at lunch on Monday or over the weekend "was not particularly consequential." (*Id.*)

Pinkston contends that the state court's decision was unreasonable because the state court "simply minimized" his claim. (Doc. 10, p. 56.) Pinkston has not shown entitlement to relief. Robinson testified that his wife told him to watch the news and that the person of interest in the video "looks like Paul." (Doc. 15-2, Ex. 1a, pp. 562-63.) The state court's ruling did not account for Robinson's testimony that his wife said the person in the video looked like Pinkston. But even if counsel should have objected to that portion of Robinson's testimony as impermissible hearsay, Pinkston cannot show prejudice because he admitted that he was the person in the video.

Robinson also testified that Pinkston had a full but short beard for as long as Robinson knew him. (*Id.*, p. 569) He testified that on Monday, June 8, 2015, he observed that when Pinkston returned to work from his lunch break,

63

he was clean-shaven. (*Id.*) Robinson testified that Anderson also noticed and remarked to Pinkston, "Oh, you changed your beard." (*Id.*, pp. 569-70.) At that point, as the state court noted, counsel made an objection that was sustained. (*Id.*, p. 570.) Because counsel did object, he did not perform deficiently. Pinkston has not shown that the state court unreasonably concluded that he was not prejudiced by the testimony given before the objection because the exact time he shaved his beard was not critical. Pinkston is not entitled to relief on Ground Seven.

### I. Ground Eleven

Pinkston argues that his right to due process was violated because he was tried by a six-person jury rather than a twelve-person jury, and that trial counsel was ineffective for failing to object to the six-person jury.

Respondent contends—and Pinkston concedes—that these claims are procedurally defaulted. On direct appeal, Pinkston did not bring a federal due process claim based on the six-person jury. (Doc. 15-4, Ex. 3.) Nor did Pinkston argue in his postconviction motion that counsel was ineffective for failing to object to the number of jurors. (Doc. 15-5, Ex. 8.)  Because Pinkston cannot return to state court to present these claims in untimely and successive proceedings, they are considered exhausted. *See Shinn v. Ramirez*, 596 U.S. 366, 378 (2022) (noting that state-court remedies are exhausted "when they are no longer available, regardless of the reason for the unavailability" (quoting

64

*Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006)). But these claims are procedurally defaulted because they were "not presented to the state courts 'consistent with [the State's] own procedural rules' " requiring Pinkston to raise these issues either on appeal or in postconviction proceedings. *Ramirez*, 596 U.S. at 378 (quoting *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000)).

Pinkston argues that he has established cause and prejudice to excuse the default under *Martinez v. Ryan*, 566 U.S. 1 (2012). *Martinez* allows for federal habeas review of some defaulted ineffective assistance of trial counsel claims when, among other requirements, the underlying ineffective assistance claim has "some merit." *Id.* at 14.

*Martinez* does not excuse the default of these claims. First, *Martinez* does not apply to claims other than those alleging ineffective assistance of trial counsel. *See Chavez v. Sec'y, Fla. Dep't of Corr.*, 742 F.3d 940, 945 (11th Cir. 2014). Thus, Pinkston cannot overcome the default of his due process claim under *Martinez*. Second, Pinkston has not shown that *Martinez* applies to excuse the default of his ineffective assistance of trial counsel claim because his ineffective assistance claim lacks merit. The Supreme Court has held that the Constitution permits a six-person jury. *See Williams v. Florida*, 399 U.S. 78, 103 (1970) ("[P]etitioner's Sixth Amendment rights, as applied to the States through the Fourteenth Amendment, were not violated by Florida's decision to provide a six-man rather than a 12-man jury."); *United States v. Stewart*, 700

65

F.2d 702, 704 (11th Cir. 1983) ("[A] twelve-person jury is not a constitutional requirement.").

Pinkston contends that the Supreme Court implicitly overruled *Williams* in *Ramos v. Louisiana*, 590 U.S. 83 (2020). *Ramos* held that the Constitution requires a unanimous jury decision, but did not overturn *Williams* to require twelve jurors. *Id.* at 93. *Williams* remains controlling precedent. *See, e.g.*, *Cunningham v. Florida*, 144 S.Ct. 1287, 1288 (2024) (Gorsuch, J., dissenting from denial of certiorari) ("[W]e should have granted review in Ms. Cunningham's case to reconsider *Williams*."). Trial counsel was not ineffective for failing to raise a meritless claim. *See Thompson*, 826 F. App'x at 727.. Accordingly, Pinkston's claims are procedurally defaulted and therefore barred from federal habeas review. Pinkston is not entitled to relief on Ground Eleven.

### J. Ground Twelve

Pinkston asserts entitlement to relief based on the cumulative effect of counsel's alleged errors. The state court denied this claim on postconviction review. This decision was not unreasonable. Having failed to establish any instances of ineffective assistance of counsel, Pinkston cannot show a cumulative prejudicial effect. *See United States v. Joseph*, 978 F.3d 1251, 1265 (11th Cir. 2020) ("Joseph has not established a single error, let alone the aggregation of many errors. . . . Joseph's cumulative error claim therefore lacks merit.").

## V.   CERTIFICATE OF APPEALABILITY

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Pinkston must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Pinkston has not made the requisite showing. Finally, because Pinkston is not entitled to a COA, he is not entitled to appeal in forma pauperis.

It is therefore **ORDERED** that Pinkston's Amended Petition for Writ of Habeas Corpus, (Doc. 10), is **DENIED**. The **CLERK** is directed to enter judgment against Pinkston and in Respondent's favor and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on March 13, 2026.

Kathryn Kimball Mizelle
United States District Judge

67